[No. 83673-6. En Banc.]
Argued September 21, 2010.    Decided March 10, 2011.

QUALCOMM, INC., *Petitioner*, v. THE DEPARTMENT OF REVENUE, *Respondent*.

*Michele G. Radosevich* (of *Davis Wright Tremaine LLP*) (*Peter D. Edgerton, Scott J. Heyman, Carter G. Phillips, Richard D. Klingler*, and *Lowell J. Schiller* of *Sidley Austin*, of counsel), for petitioner.

*Robert M. McKenna, Attorney General, Alan D. Copsey, Deputy Solicitor General, Cameron G. Comfort, Senior Assistant,* and *Brett S. Durbin, Assistant,* for respondent.

*Philip A. Talmadge* and *Emmelyn Hart* on behalf of Washington Trucking Associations and American Trucking Associations Inc., amici curiae.

*Terry F. Berman, Robert B. Kelly, Jonathan Jacob Nadler,* and *Mark D. Johnson* on behalf of Intelligent Transportation Society of America, amicus curiae.

¶1 CHAMBERS, J. — Qualcomm Inc. sells the "OmniTRACS" system to trucking companies. The system includes hardware, software, and a service that collects, manipulates, and transmits data from the trucks to the companies' dispatch centers. Under our tax system, the legislature imposes different business and occupation (B&O) tax rates depending on the nature of the business. Thus the "retailing B&O" tax rate is lower than the "service B&O" tax rate. Similarly, retail sales tax applies to some transactions but not others. "Network telephone services," as defined by statute, are subject to both retailing B&O tax and retail sales tax, while "information services" are subject to only the service B&O tax.

¶2 The parties disagree as to which classification most accurately describes the services Qualcomm provides. The Washington State Department of Revenue (DOR) contends that Qualcomm's services should be taxed at the higher "network telephone service" rate.[1] Qualcomm argues that the lower "information service" rate should apply. We adopt the "primary purpose of the purchaser" rule when a service

---

[1] Although the retailing B&O tax is lower than the service B&O tax, the retailing B&O tax in combination with retail sales tax makes "network telephone services" generally subject to a higher overall tax rate than "information services."

involves both the collection and processing of data and the transmission of data to determine whether the "network telephone service" or "information service" rate should apply. Under the specific facts of this case, we determine that the primary purpose of the purchasers of the Qualcomm Omni-TRACS system's service is to obtain the data generated by the system. We reverse the Court of Appeals and hold that the "information services" tax rate applies.

## FACTS AND PROCEDURAL HISTORY

¶3  The OmniTRACS system sold by Qualcomm to trucking companies provides information about the location of vehicles on the road, performance of drivers, and operation of the trucks and trailers. The OmniTRACS system has been broken down by the State for taxing purposes into three distinct components. First, the system requires hardware in the truck called "mobile communications terminals" (mobile terminals). The mobile terminals collect vehicle and driver performance data such as the location and routes traveled and can also collect information about the operation of the trucks themselves such as miles per gallon, rapid acceleration and deceleration, and operating temperatures. The mobile terminals also allow drivers to create, send, and receive messages. Second, the service relays messages and positioning information from the truck's hardware to Qualcomm's network management facility (network facility) where the data is processed and stored until the trucking company retrieves it. The parties refer to this component as the "service," and we will adopt their term. Third, software installed on computers at a trucking company's dispatch center allows dispatchers to use the data; for example, they can view a truck's location on a map or create invoices. The dispatchers retrieve the data from the network facility via an Internet or landline connection that generally is not provided by Qualcomm. The service is

useless without the mobile terminals and software, which in turn are useless without the service.[2]

¶4 The service that is the subject of this dispute performs multiple functions relating to positioning and messaging. The fundamental aspect of the service is location tracking for trucks. The basic OmniTRACS service costs $35 a month and calculates a truck's location hourly using Qualcomm's proprietary Qualcomm Automatic Satellite Position Reporting (QASPR) system or the Global Positioning System (GPS). Over 90 percent of trucks equipped with OmniTRACS use QASPR. QASPR calculates location by sending signals from two satellites to the truck's hardware and then relaying the recorded signal strength via one of the satellites to the network facility, where computers triangulate the truck's position. The remaining 10 percent of trucks use GPS units that send longitude and latitude coordinates to the network facility via satellite without the need for additional calculations to determine location.

¶5 The service sends the hourly messages containing a truck's location information to the network facility where they are processed into a "data packet" for the customer containing an identification number for each vehicle and a time and date stamp. The trucking companies can retrieve these messages at their convenience by accessing the network facility via Internet connection or phone line and then using the software to view and manipulate the retrieved information.

¶6 Although the majority of messages sent over the service provide location information, the service can be used

---

[2] DOR asserts that "if Qualcomm were to stop selling the monthly OmniTRACS service, customers would not need to purchase the entire system from a third party, only the capabilities provided by the OmniTRACS service." Resp't's Suppl. Br. at 9. While it may be strictly true, this hypothetical is a stretch and conflicts with the multiple descriptions of the system in the record. As far as the record shows there is no available service other than Qualcomm's that works with the OmniTRACS hardware and software—that is presumably the whole point of the business model. Regarding the service, the Qualcomm contract specifically states that "[t]he OmniTRACS Service consists of a two-way Ku-band, satellite-based, mobile messaging and position location reporting service (the 'Service') *using the Equipment and Software which is provided to Customer* pursuant to this Agreement." Clerk's Papers at 188 (emphasis added).

to send other types of messages. The most common are "macro" messages, standardized messages created by a driver pressing a single key, such as delivery confirmations. Less common are "free-form" messages, which allow the author to compose a unique message. Finally, optional "SensorTRACS" messages report data about the truck and the driver's performance that is gathered by special hardware on the truck, and "TrailerTRACS" can deliver information about trailer connections and the status of refrigerated units. To pay for these additional messages, a customer can subscribe to enhanced OmniTRACS service for $50.00 a month and receive a set number of messages or pay $0.05 per message plus $0.002 per character. Data transmission may be initiated automatically by specified events, such as increases over a certain speed or temperature, or at the request of the customer's dispatch office. The data is received and stored at the network facility and can be retrieved by the software at dispatch in a similar manner to the location tracking information and other messages.

¶7 During the relevant years in this case, 1998-2001, Qualcomm paid taxes at the information service rate and did not collect retail sales tax on the service. The software and hardware were taxed separately, and Qualcomm paid retail sales tax on those components.[3] In 2002, DOR audited Qualcomm and assessed $900,573 in uncollected retail sales tax, retailing B&O tax, and interest on sales of the service, concluding it was a network telephone service and not an information service.

¶8 Qualcomm unsuccessfully challenged the assessment before DOR's appeals division. Qualcomm paid the tax and filed a refund lawsuit in superior court, which upheld the assessment and dismissed the refund action on summary judgment. The Court of Appeals affirmed. *Qualcomm, Inc. v. Dep't of Revenue*, 151 Wn. App. 892, 213 P.3d 948 (2009).

---

[3] *See* Wash. Dep't of Revenue, Determination No. 05-0377, 27 Wash. Tax Dec. 51, 52 n.2, 2005 Wash. Tax LEXIS 774, at *21 n.2 ("The taxpayer also sold hardware and software relating to these services. To the extent these sales were subject to Washington taxation, the taxpayer does not dispute that these sales were properly classified under the retailing classification.").

## STANDARD OF REVIEW

¶9 We are asked to interpret former RCW 82.04-.065(2) (LAWS OF 1997, ch. 304, § 5), *amended by* LAWS OF 2007, ch. 6, §§ 1002, 1003. The interpretation of a statute is a question of law. *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001). We review grants of summary judgment and questions of law de novo. *Berrocal v. Fernandez*, 155 Wn.2d 585, 590, 121 P.3d 82 (2005). We construe ambiguous tax statutes in favor of the taxpayer. *Ski Acres, Inc. v. Kittitas County*, 118 Wn.2d 852, 857, 827 P.2d 1000 (1992). However, the taxpayer bears the burden of proving that the tax paid was incorrect. RCW 82.32.180; *Tidewater Terminal Co. v. State*, 60 Wn.2d 155, 162-63, 372 P.2d 674 (1962).

## ANALYSIS

### 1. STATUTORY LANGUAGE

¶10 We first look to the applicable statutes. DOR assessed Qualcomm retail sales tax and retailing B&O tax as a "network telephone service" under former RCW 82.04.065(2) (1997), which reads in part:

> "Network telephone service" means the providing by any person of access to a local telephone network, local telephone network switching service, toll service, or coin telephone services, or *the providing of* telephonic, video, *data*, or similar communication or *transmission for hire, via* a local telephone network, toll line or channel, cable, *microwave*, or similar *communication* or transmission *system.*

(Emphasis added.)

¶11 Qualcomm argues that the service is not a "network telephone service" but rather an "information service."[4]

---

[4] "Information service" was not specifically defined by statute during the time relevant to this case. However, as discussed below, later statutory amendments clarified that data processing and information services are exempt from taxation as a "telecommunications service." RCW 82.04.065(27). The new term "telecom-

WAC 458-20-155 defines "information services" as "every business activity, process, or function by which a person transfers, transmits, or conveys data, facts, knowledge, procedures, and the like to any user of such information through any tangible or intangible medium. . . . Neither does the term include telephone service defined under RCW 82.04.065."[5] Information services are taxable at service B&O tax rates and are not subject to retail sales tax.

¶12 We have twice considered the definition of "network telephone service" in former RCW 82.04.065(2) (1997). In *Western Telepage, Inc. v. City of Tacoma Department of Financing*, 140 Wn.2d 599, 998 P.2d 884 (2000), we held that former RCW 82.04.065(2) (1997) unambiguously included paging services because they involved the transmission of data. Focusing on the dictionary definition of " 'data,' " we explained that "paging services involve the transmission or communication of data because the service transmits numeric and alpha-numeric information to customers by microwave." *Id.* at 610. Under a plain language analysis, we rejected the argument that the statute applied to only two-way communications because nothing in the statute expressly required two-way communications. *Id.* at 611. However, as the Court of Appeals correctly noted, *Western Telepage* is of limited value in applying former RCW 82.04.065(2) (1997) to this case because the parties in *Western Telepage* did not argue that the paging service was an information service. *Qualcomm*, 151 Wn. App. at 899-900.

¶13 In *Community Telecable of Seattle, Inc. v. City of Seattle*, 164 Wn.2d 35, 186 P.3d 1032 (2008), we held that Comcast's provision of cable Internet was not taxable as a "network telephone service" for purposes of former RCW 82.04.065(2) because Comcast's activities were "internet services," defined separately by statute and expressly ex-

munications service" replaced the term "network telephone service." *See* former RCW 82.04.065(2) (1997).

[5] Former RCW 82.04.065(3) (1997) stated, " 'Telephone service' means competitive telephone service or network telephone service, or both, as defined in subsections (1) and (2) of this section."

cluded from the definition of "network telephone service."[6] Although our holding relied primarily on the statute's express exclusion of Internet services, we further supported this conclusion by noting that

> Comcast "transforms" and "manipulates" data as it passes through the Comcast network; this manipulation is an integral and necessary part of the provision of Internet services. Even where Comcast passes on data to another entity . . . that passed data would not be useful unless Comcast had transformed the data along the way. Therefore, Comcast is not engaging in the mere "provision of transmission" under RCW 82.04.065(2).

*Cmty. Telecable*, 164 Wn.2d at 44 (citations omitted).

¶14 Qualcomm relies heavily on this language from *Community Telecable* to argue that the network facility's location calculations, time- and date-stamping, data packaging, organization, and storage transforms and manipulates information rather than merely transmitting it. While helpful to Qualcomm's position, *Community Telecable*'s language must be read in context. The statute in *Community Telecable* explicitly excluded Internet services, and we thus did not have cause to fully develop the relationship between transmission and data processing. *Id.* at 43-44. Ultimately, the language from *Community Telecable* does not make the meaning of "network telephone service" plain as applied to a non-Internet service containing both transmission and information processing elements.[7]

---

[6] Former RCW 82.04.065(2) (1997) states in part, " 'Network telephone service' does not include the providing of competitive telephone service, the providing of cable television service, the providing of broadcast services by radio or television stations, nor the provision of internet service as defined in RCW 82.04.297, including the reception of dial-in connection, provided at the site of the internet service provider."

[7] The dictionary definition of "transmission" also does not resolve the question of whether the service is a "network telephone service." The dictionary defines "transmission" in relevant part as "an act, process, or instance of transmitting" or "the passage of radio waves in the space between transmitting and receiving stations." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2429 (2002). In turn, "transmit" means "to cause to go or be conveyed to another person or place," "to pass on or spread about," "to cause (as a light or force) to pass or be conveyed through space or a medium <the telephone ~s sound>" or "to send out a signal

## 2. LEGISLATIVE HISTORY

¶15 In 2007, the legislature amended RCW 82.04.065 and replaced the phrase "network telephone service" with "telecommunications service." LAWS OF 2007, ch. 6, § 1002(8). Both parties find support for their positions in the 2007 revisions of former RCW 82.04.065(2) (1997). In the new statute, the renamed "telecommunications service" explicitly excludes "[d]ata processing and information services that allow data to be *generated, acquired, stored, processed, or retrieved* and *delivered by an electronic transmission* to a purchaser where such purchaser's primary purpose for the underlying transaction is the processed data or information." Former RCW 82.04.065(8)(a) (2007) (emphasis added), *recodified as* RCW 82.04.065(27)(a).

¶16 Legislative history shows that the changes to terminology regarding telecommunications were intended to preserve the existing state of the law while implementing terminology of the Streamlined Sales and Use Tax Agreement (SSUTA).[8] FINAL B. REP. on Second Substitute S.B. 5089, at 3, 60th Leg., Reg. Sess. (Wash. 2007). The final bill report states, "Several telecommunication definitions recently incorporated into the SSUTA are adopted. These are changes to terminology in current law, but *do not change current law regarding taxability and exemptions." Id.* (emphasis added).

¶17 Qualcomm argues that the new terminology is consistent with the historical intent behind the definition of

---

either by radio waves or over a wire line." *Id.* But since an information service includes "every business activity . . . by which a person . . . *transmits* . . . data . . . to any user of such information through any . . . medium," the mere fact of transmission can never be dispositive in distinguishing an information service from a network telephone service. WAC 458-20-155 (emphasis added).

[8] SSUTA is "the result of the cooperative effort of 44 states, the District of Columbia, local governments and the business community to simplify sales and use tax collection and administration by retailers and states." *Frequently Asked Questions*, STREAMLINED SALES TAX GOVERNING BOARD, INC., http://www.streamlined salestax.org/index.php?page=faqs (last visited Mar. 2, 2011). The agreement is meant to "ensure[ ] that all retailers can conduct their business in a fair, competitive environment." *Id.* (emphasis omitted).

"network telephone service" to tax only pure transmission. Opening Br. of Appellant at 15-16. It refers us to the legislature's reaction to the breakup of the Bell system in the 1980s. *See* Clerk's Papers (CP) at 230-31. New and unregulated competitors arose upon the breakup, mainly selling a variety of telephone equipment, but with an interest in providing transmission services in the future. Pacific Northwest Bell and General Telephone were still heavily regulated from their days as utility monopolies and typically charged one lump sum for furnishing equipment and the service itself. The tax scheme in place at the time, and the manner in which the companies did business, resulted in tax rates that were lower for the new competitors. *See* former RCW 82.16-.010 (LAWS OF 1981, ch. 144, § 1) ("[I]t is the intent of the legislature to place telephone companies and nonregulated competitors of telephone companies on an equal excise tax basis with regard to the providing of similar goods and services."). The legislative solution was to divide the provision of access to a telephone network for communication purposes and the provision of telephone equipment and maintenance services. *See* CP at 230-31; former RCW 82.16-.010(6), (15) (1981). The language the legislature used for the new definition of "telephone business" provided the basis for all subsequent definitions of "network telephone service" and "telecommunications service."[9] *Compare* former RCW 82.16.010(6), *with* former RCW 82.04.065(2) (1997), *and* RCW 82.04.065(27). Qualcomm argues its service component is clearly not a communications network when understood in this historical context.

---

[9] The 1981 version of the statute reads:

"Telephone business" means the business of providing access to a local telephone network, local telephone network switching service, toll service, or coin telephone services, or providing telephonic, video, data, or similar communication or transmission for hire, via a local telephone network, toll line or channel, or similar communication or transmission system. . . . "Telephone business" does not include the providing of competitive telephone service, nor the providing of cable television services.

Former RCW 82.16.010(6).

¶18 DOR counters that the 2007 legislative revision affirms its position that a service that processes data or adds information is not automatically excluded from either the definition of "network telephone service" or "telecommunications service." Br. of Resp't at 14. DOR points to the language *where such purchaser's primary purpose for the underlying transaction is the processed data or information.*" RCW 82.04.065(27)(a) (emphasis added). The question, according to DOR, "is whether the service is purchased *primarily* to provide a means of transmission or communications, or is purchased *primarily* to acquire new information or processed data." Br. of Resp't at 15.

¶19 Here, the service undoubtedly provides data transmission for hire when it conveys messages by satellite from a truck to the network facility's computers. But just as surely, the service goes beyond mere conveyance. The service generates, collects, manipulates, and thereby processes the data. It triangulates the trucks' locations by measuring signal strength from the communications satellite and a second satellite. At the network facility, incoming messages are dated and time-stamped. All messages are then stored at the network facility until customers choose to retrieve them. The question of how to classify for tax purposes a service like Qualcomm's that includes elements of both a telecommunications and information service is a question of first impression in this court.

### 3. THE PRIMARY PURPOSE TEST

¶20 DOR informs us it has long used the primary purpose test to determine whether a particular taxpayer activity should be classified as a retail sale or a service. *See* Br. of Resp't at 19-20. DOR has used this test specifically to distinguish between a "network telephone service" and an "information service." Wash. Dep't of Revenue, Determination No. 90-128, 9 Wash. Tax Dec. 280-1, 280-4 (1990). The primary purpose test is often referred to as the "true object"

test. *See* Jerome Hellerstein, *Significant Sales and Use Tax Developments During the Past Half Century*, 39 VAND. L. REV. 961, 968 (1986). This test is a common one and has been applied in a number of jurisdictions for at least 30 years. *Id.* According to DOR, it is the "prevailing test applied by the courts for distinguishing between nontaxable sales of services versus taxable sales of tangible property." Wash. Dep't of Revenue, Determination No. 89-009A, 12 Wash. Tax Dec. 1, 5, 1992 Wash. Tax LEXIS 1462, at *8 (1992). DOR has also used this test to determine whether (among other things) a retail sales tax and retailing B&O tax applied. *Id.* In order to determine a particular transaction's tax rate, this test focuses on the real object of the transaction sought by the taxpayer's customers and not just the transaction's different parts. Determination No. 90-128, 9 Wash. Tax Dec. at 280-84.

¶21 Ohio's Supreme Court articulated its view of the true object test when it applied the test in a case that dealt with a manufacturer seeking bids from other contractors with the aid of an expensive "bid package." *Emery Indus., Inc. v. Limbach*, 43 Ohio St. 3d 134, 539 N.E.2d 608 (1989). Emery, an industrial chemical manufacturer, hired a general contractor for a project; the general contractor then put together a bid package containing plans, designs, and specifications—all the information the subcontractors would need to make their bids. *Id.* Emery paid handsomely for the package, and the subcontractors used it both for their bidding and to build the project. Under Ohio's tax scheme, retail sales are taxable but personal services are not. *Id.* Ohio's tax commissioner determined that the bid package was a retail sale and assessed sales tax against Emery, and the Board of Tax Appeals (BTA) affirmed. *Id.* The Supreme Court of Ohio reversed the BTA and held that the "overriding purpose" (i.e., the true object) of the manufacturer was to obtain other companies' *services* and not just the *documents* that related to the companies' bids. *Id.* at 139. The court explained:

> [I]n a professional, insurance or personal service transaction in which the charge for the services is not separated from the

charge for the property, if the *overriding purpose* of the purchaser is to obtain tangible personal property produced by the service, the transfer of the property is a consequential element of the transaction and the entire transaction is taxable. If the purchaser's *overriding purpose* is to receive the service, the transfer of the personal property is an inconsequential element of the transaction, and the entire transaction is not taxable.

*Id.* (emphasis added). In other words, this test "seeks the essential reason the buyer enters the transaction—either to obtain the service or the property produced by the service." *Id.* The court reasoned:

When one hires an attorney to draft a will, he seeks the distribution of his estate at his death. When one engages an accountant to issue an audit opinion, he seeks a review of his finances and a report of his financial standing. Documents are important in both instances because the probate court will not accept the lawyer's word regarding the decedent's bequest, but must see the document. A bank will not accept the accountant's oral version of the client's financial condition, but must see the tangible evidence of the accountant's investigation. The tangible will and the tangible balance sheet are concrete, documentary proof of the testator's desire and the loan applicant's financial status. However, *the overriding purpose of each client was something beyond the documents—the distribution of a decedent's estate or the quantification of an ongoing estate.* The professional's skill accomplished this; the transferred paper documented the details of the service.

*Id.* (emphasis added).

¶22 The Supreme Court of Colorado has also taken an in-depth look at the true object test in a case involving licensing of artwork. *City of Boulder v. Leanin' Tree, Inc.*, 72 P.3d 361 (Colo. 2003). In attempting to ascertain whether the buyer's true intent was to obtain the artwork itself or the right to use the artwork, the *Leanin' Tree* court surveyed factors courts have considered in determining the primary purpose:

Some courts have compared the value of the tangible property with that of the intangible property or service. *See, e.g., Wash-*

*ington Times-Herald v. District of Columbia*, 213 F.2d 23, 24 (D.C.Cir. 1954) . . . . Other decisions have considered whether there was an alternative method of transfer. *See, e.g., Commerce Union Bank v. Tidwell*, 538 S.W.2d 405, 408 (Tenn.1976) (no taxable transfer where computer programming information conveyed by magnetic tape could have been transmitted by telephone lines or fed directly into the computer). The length of time the information provided retains its value has also been considered significant. *See, e.g., Fingerhut [Prods. Co. v. Comm'r of Revenue]*, 258 N.W.2d [606,] 609 [(Minn. 1977)] (mailing lists containing names of potential buyers had limited useful life expectancy). Some decisions have looked for constraints on the buyer's ability to use the tangible property. *See, e.g., Dun & Bradstreet v. City of New York*, 276 N.Y. 198, 204-05, 11 N.E.2d 728, 731 (1937) (significant that subscriber of confidential information was not allowed to share it with public). Yet others have examined what is actually done with the tangible property after it has yielded the intangible component. *See, e.g., Commerce Union Bank*, 538 S.W.2d at 408 (sale of computer software not tangible personal property where once information was transferred into computer, tangible property was returned or destroyed). Finally, several jurisdictions have considered whether the tangible property represents the finished product sought by the buyer. *See, e.g., Columbus Coated Fabrics Div. v. Porterfield*, 30 Ohio St.2d 307, 285 N.E.2d 50, 53 (1972).

*Id.* at 365-66 (some citations omitted).[10]

---

[10] Interestingly, after its extensive discussion of this test, the court in *Leanin' Tree* rejected it in favor of another test that it called the "common understanding" test:

> Varied as these analyses may be, they largely share in common some attempt to identify characteristics of the transaction at issue that make it either more analogous to what is reasonably and commonly understood to be a sale of goods, or more analogous to what is generally understood to be the purchase of a service or intangible right. . . .
>
>     . . . .
>
> Unless the attempt to distinguish tangible from other-than-tangible property is abandoned altogether, some multi-factor or totality of circumstances test, permitting characterization of the transaction according to a reasonable and common understanding of those concepts, is virtually unavoidable.

*Leanin' Tree*, 72 P.3d at 366 (citing 2 JEROME R. HELLERSTEIN & WALTER HELLERSTEIN, STATE TAXATION ¶ 12.08[2] (3d ed. 2002)).

¶23 While the case before us does not involve an attempt to separate tangible goods from intangible services, it presents an analogous problem. Here, we must determine if the primary purpose was information processing or information transmission.[11] Qualcomm and DOR seem to agree that when an activity involves both transmission and information processing components that cannot be reasonably separated, the true object test applies to determine the proper tax classification.[12] The core of their dispute is in regard to what unit the test should apply: the entire OmniTRACS mobile communications system, just the OmniTRACS service, or the different types of messages relayed by the service (location tracking, macro messaging, free-form messaging, and SensorTRACS messaging).

### a. *The System as a Whole*

¶24 Qualcomm argues that the court should evaluate the true object of the entire system, including the software and hardware. It points out that although separately priced, the three elements of the system are nearly always sold in a single contract, and each standing alone is useless without the others. *See* Pet'r's Suppl. Br. at 15 (citing CP at 30, 76-77, 184-90 (example contract)). The system is marketed as a unified whole, and its utility to the customer comes from using all three components. Amici Washington Trucking Associations (WTA) and American Trucking Associations (ATA) agree, arguing that OmniTRACS customers "are not buying a telecommunications system[,] . . . trucking carriers are buying a vital truck and driver management

---

[11] It is perhaps even more challenging to attempt a conceptual separation of purpose between providing information services and transmitting information than it is to distinguish whether the true object is a good or a service. Nevertheless, that is the task the legislature has suggested courts must perform in situations where, as here, a service provides both information and transmission of information. *See* RCW 82.04.065(27).

[12] *See* Opening Br. of Appellant at 19-22 (explaining and applying the true object test); Br. of Resp't at 20 ("In cases when there is no reasonable basis to bifurcate the transaction, the transaction is taxed according to its 'true object,' i.e., the primary or predominant nature.").

tool that utilizes processed data or information to enable them to supervise their drivers and to ensure efficient deliveries." Br. of Amici Curiae WTA and ATA at 2.

### b. *The Service*

¶25 DOR argues that, like the Court of Appeals, we should consider the primary purpose of only the service, without considering the hardware or software that Qualcomm sells separately. It notes that former RCW 82.08.020 (1998) imposes a retail sales tax on each retail sale. Resp't's Suppl. Br. at 9. It claims that DOR's "longstanding position" has been that "separate and distinct products or services sold together will be taxed individually if there is a reasonable basis to determine the price of the individual products or services." *Id.* at 10. Because the hardware and software are sold for a one-time price, and the service is a monthly charge, DOR contends that the service must be looked at in isolation. *Id.* at 14. Further, DOR argues the service in isolation does only one thing—it transmits information. *See id.* at 16.

¶26 DOR's argument is oversimplified for several reasons. First, Qualcomm is required to separate the hardware and software because DOR assesses a retail sales tax on those components. *See* RCW 82.08.020(1). Customers buy the hardware and software to operate and utilize the service. The fact that the hardware and software are taxed separately at the retail rate does not answer the question of whether each component is purchased with an independent primary purpose and whether the service is incidental to the system as a whole.[13] The fact that the service is independently billed is certainly a consideration but does not control the tax classification.[14]

---

[13] We do not mean to suggest that the hardware and software cannot or should not be taxed separately, only that the mere fact that they are taxed separately does not change the analysis under the primary purpose test.

[14] In the Court of Appeals, DOR argued that the service should be further broken down into tax classifications for location reporting messages and all other messages

¶27 Second, Qualcomm persuasively argues that the true purpose of a company's buying its integrated OmniTRACS system is to obtain a management tool, not a telecommunications service. The system provides a trucking company with detailed information about its trucks and drivers while they are away from the company's place of business. The system's core function for the purchaser is to track the trucks to make sure they are taking the most direct or efficient route and are not stopping for excessive periods. The system can provide information about the safety and reliability of the truck itself, including engine revolutions per minute, speed, time idling, and hard braking. Information is also available about number of hours in service, temperature data on refrigerated trailers, and the status of trailer connections.[15] The system has proved a useful management tool for planning estimated times of arrival. When interfaced with the customer's other computerized applications, automated billings can be generated. The legislature contemplated just such integrated systems in the amended version of the statute at issue here. Services that "allow data to be generated, acquired, stored, processed, or retrieved *and delivered by an electronic transmission*" are exempt from taxation as a telecommunications service where the purchaser's primary purpose "*is* the processed data or information." RCW 82.04.065(27)(a) (emphasis added). The service is an integral part of the primary goal of acquiring specific useful information about trucks on the road. As the amended

---

(macro, free-form, and SensorTRACS). Br. of Resp't at 18-21. Qualcomm's billing practices, DOR explained, provide a reasonable method to separate these services. *Id.* In particular, the $35 a month for basic service buys only location reporting messages; the additional $15 a month for enhanced service buys only macro, free-form, and SensorTRACS messages; and any individually billed messages are classified on Qualcomm's bills by type, making them easy to identify and tax accordingly. *Id.* Considering these categories of messages separately, DOR argued the nonlocation messages are clearly "network telephone services," while the location reporting messages are a closer case. Although not before us now, the nonlocation messages are truly incidental to the service's location reporting function such that separate tax classifications are not appropriate.

[15] Thus, for example, a company can keep track of whether a trailer is connected to a particular truck at a particular time or whether the truck is "running bobtail," to use trucking vernacular.

statutory language makes clear, the underlying purpose of the service does not change simply because it delivers that information by an electronic transmission.[16]

¶28 Finally, even if the service were viewed in isolation as DOR suggests, it still appears to be primarily an information service rather than a telecommunications service. As stated above, the core function of the service is to provide up-to-date location tracking. Over 90 percent of the trucks are tracked by satellite triangulation. Qualcomm's service uses two satellites to measure the strength of a truck's signal. First the network facility tells the satellites to ping the truck. The hardware on the truck measures the strength of the signals. That information is transmitted by one of the satellites back to the network facility, where the final triangulation calculations are made. The service— what customers are paying for on a monthly basis—is comprised of two satellites and the network facility that operate in conjunction *for the purpose of generating location data*. Thus, the service itself, as it is most commonly used, is actually creating the location information, and obtaining that location information is the primary purpose of the purchaser.[17]

¶29 In *Community Telecable*, we found it significant that Comcast " 'transforms' " and " 'manipulates' " data as it passes though the Comcast network. *Cmty. Telecable*, 164 Wn.2d at 44. "[T]his manipulation is an integral and necessary part of the provision of Internet services." *Id.* The raw data

---

[16] An example of another integrated system, analogous to Qualcomm's, may be instructive. A recently devised service uses sensors installed on a cow to monitor the cow's vital signs. *Smart Systems: Living in a See-Through World*, ECONOMIST, Nov. 6-12, 2010, at 21. The data from the sensors is sent wirelessly to a computer, which in turn sends messages to the cow's owner to inform him of the cow's condition. *Id.* The purpose is manifestly not to allow communication over distance between the cow and farmer, but to provide the farmer with predetermined specific information about the cow. Here, similarly, the primary purpose of Qualcomm's system is to provide companies with specific information about trucks, not communication with the driver.

[17] The fact that less than 10 percent of trucks use GPS to determine location does not alter the analysis. Qualcomm overwhelmingly uses the service itself to generate location data, and that generated location data comprises the great majority of all messages communicated by the communications satellite.

gathered by the OmniTRACS system's hardware would be unintelligible without the calculations performed by Qualcomm. Further, the company cannot access the data stored at Qualcomm's network facility without the software provided by Qualcomm.[18] The primary purpose of the OmniTRACS system is to provide specific useful information to management about drivers and equipment on the road. As the ATA and WTA point out, the service "does not serve as a replacement for a driver's cell phone." Br. of Amici Curiae WTA and ATA at 7. Further, "the text messaging component of OmniTRACS cannot practically be used to carry on a two-way exchange between the driver and fleet management center." CP at 32. Rather, the usefulness of macro, free-form, and SensorTRACS messages is to provide information in conjunction with the truck's location at the time the message is sent. A macro message confirming delivery, for example, would be nearly worthless if not combined with the automatic reporting function. Applying the primary purpose test, we hold the service is excluded from network telephone or telecommunication services as "[d]ata processing and information . . . delivered by an electronic transmission to a purchaser where such purchaser's primary purpose for the underlying transaction is the processed data or information." RCW 82.04.065(27)(a).

## CONCLUSION

¶30 The OmniTRACS system has three components: hardware and software installed in trucks, the service, and software installed in the customers' computers. The service both collects and manipulates data and transmits that data to the customer. When a service involves both telecommunications and information processing, we adopt the primary purpose of the purchaser test to determine the applicable

---

[18] DOR points out that some customers have opted to write their own software to access the data stored by the service at the network facility. However, this number amounts to less than one percent of Qualcomm's total customer base.

tax rate. We hold that under the facts of this particular case, the service should be taxed as an "information service" rather than a "network telephone system." We reverse the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

C. JOHNSON, ALEXANDER, OWENS, and J.M. JOHNSON, JJ., and SANDERS, J. PRO TEM., concur.

¶31 FAIRHURST, J. (dissenting) — While I agree with the majority that the primary purpose test should determine the "OmniTRACS" service's tax classification, I disagree with how the majority applies the test in this case. The primary purpose test should consider why Qualcomm's customers purchase the OmniTRACS service alone, not why they buy the entire OmniTRACS system. Because the customer buys the OmniTRACS service primarily to overcome the classic communications dilemma of transmitting information over vast physical distances, I conclude it was properly taxed as a " '[n]etwork telephone service' " as defined in former RCW 82.04.065(2) (1997).

I.  The primary purpose test should apply to only the OmniTRACS service, not the entire OmniTRACS system

¶32 The Washington Department of Revenue (DOR) has long used the primary purpose test to determine whether a product should be taxed as a retail sale or a service when the product has elements of both. *See, e.g.*, DOR, Determination No. 89-009A, 12 Wash. Tax Dec. 1, 5, 1992 Wash. Tax LEXIS 1462 (1992), *available at* http://taxpedia.dor.wa.gov/zipfiles.htm. Often, price determines the unit to which the primary purpose test applies; that is, a separately priced item is assigned a single tax category based on the customer's primary purpose in purchasing that item.[19] But if one

---

[19] The idea that pricing often determines what comprises a single taxable unit flows from the language of the statute itself. Sales tax is imposed on "each" retail

sale or service is merely incidental to another sale or service, the primary purpose test may require a single tax category for the related items even though they are priced separately.

¶33 For example, in one DOR decision, the taxpayer charged its customers separately for use of its data processing service and for dedicated telephone lines to access that service. DOR, Determination No. 90-128, 9 Wash. Tax Dec. 280-1, 2 (1990), *available at* http://taxpedia.dor.wa.gov/ zipfiles.htm. The taxpayer's form contract devoted several pages to describing the data processing service, while the only mention of telephone access was a single phrase noting the customer's obligation to pay for "on-line availability." *Id.* at 5. The taxpayer did not dispute that its data processing service was classifiable as "information services,"[20] but it argued that the telephone line charges should be separately taxable as a "network telephone service."[21] *Id.* at 3-4. DOR disagreed, concluding the telephone line charges must be taxed as "information services" because "the furnishing of the telephone lines is not the object of the transaction, but merely incidental to the personal services being rendered." *Id.* at 4.

¶34 DOR again applied the primary purpose test to determine whether a transaction was "information services"

___

sale. RCW 82.08.020(1). A " '[s]ale' " is "any transfer of the ownership of, title to, or possession of property for a valuable consideration." RCW 82.04.040(1). Consistent with this language, DOR explains that its long standing position has been that "separate and distinct products or services sold together will be taxed individually if there is a reasonable basis to determine the price of the individual products or services." Resp't's Suppl. Br. at 10.

[20] " '[I]nformation services' " means "every business activity, process, or function by which a person transfers, transmits, or conveys data, facts, knowledge, procedures, and the like to any user of such information through any tangible or intangible medium." WAC 458-20-155.

[21]

"Network telephone service" means the providing by any person of access to a local telephone network, local telephone network switching service, toll service, or coin telephone services, or *the providing of* telephonic, video, *data,* or similar communication or *transmission for hire, via* a local telephone network, toll line or channel, cable, *microwave,* or similar *communication* or transmission system.

Former RCW 82.04.065(2) (emphasis added).

or a "network telephone service" in DOR, Determination No. 98-202, 19 Wash. Tax Dec. 771, 774-76, 1998 Wash. Tax LEXIS 1033, at *7-8 (1998), *available at* http://taxpedia.dor .wa.gov/zipfiles.htm. There, the taxpayer travel agency paid a monthly fee to use a reservation system that allowed it to compare prices and book flights, hotels, and rental cars. 19 Wash. Tax Dec. at 775, 1998 Wash. Tax LEXIS 1033, at *7-8. Part of the monthly fee went to providing telephone lines that allowed the taxpayer to be continuously online and connected to the reservation system. 19 Wash. Tax Dec. at 775, 1998 Wash. Tax LEXIS 1033, at *7-8. DOR concluded that the entire monthly fee should be taxed as "information services" rather than "network telephone services" because the telephone line costs were merely incidental to the travel agency's true purpose of being able to access information and book reservations. 19 Wash. Tax Dec. at 776, 1998 Wash. Tax LEXIS 1033, at *7-8.

¶35 Here, unlike in the data processing service or reservation system in the foregoing DOR decisions, the OmniTRACS system contains no "information services" to which the OmniTRACS service could be incidental except functions provided by the OmniTRACS service itself. " '[I]nformation services' " is defined as "every *business activity, process, or function* by which a person transfers, transmits, or conveys data, facts, knowledge, procedures, and the like to any user of such information through any tangible or intangible medium." WAC 458-20-155 (emphasis added). The term does not encompass the sale of prewritten software, which is instead tangible personal property subject to retail sales tax. *Id.*[22] Qualcomm concedes its hardware and

---

[22] WAC 458-20-155 explains:

Liability for sales tax or use tax depends upon whether the subject of the sale is a product or a service. If information services, computer services or data processing services are performed, such that the only tangible personal property in the transaction is the paper or medium on which the information is printed or carried, the activity constitutes the rendering of professional services, similar to those rendered by a public accountant, architect, lawyer, etc., and the retail sales tax or use tax is not applicable to such charges. This includes the sales of software in connection with custom programs written to meet a particular customer's specific needs. The programs are considered to be

software are subject to retail sales tax.[23] The logical corollary is that the functions performed by the hardware and software in the OmniTRACS system are not "information services." In fact, the data processing functions that the majority concludes make the OmniTRACS system "information services," such as generating information about a truck's performance and compiling it into maps or reports, are actually nothing more than the product of tangible personal property owned by or licensed to Qualcomm's customers. To conclude that the OmniTRACS service is "information services" on the basis of hardware and software that are admittedly not "information services" is a serious logical problem.

¶36 Furthermore, the majority's assertion that the OmniTRACS service is merely incidental to the overall OmniTRACS system defies the nature of the product. Transmission of data is the foundation upon which the OmniTRACS system is built. The communications feature of the system is repeatedly emphasized in Qualcomm's marketing materials. It is labeled the "OmniTRACS *Mobile Communications* System" and described as offering "streamlined messaging" and "custom messaging packages." Clerk's Papers (CP) at 67-69 (emphasis added). Qualcomm's six-page form

---

the tangible evidence of a professional service rendered to a client and not subject to retail sales tax or use tax.

If, on the other hand, the sale, lease, or licensing of the computer program is a sale or lease of a product, even though produced through a computer system or process, it is taxable as a retail sale. Standard, prewritten software programs do not constitute professional services rendered to meet the particular needs of specific customers, but rather, are essentially sales of articles of tangible personal property. Articles of this type are no different from a usual inventory of tangible personal property held for sale or lease and, irrespective of any incidental modifications to the program medium or its environment (e.g., adaptation to computer room configuration) to meet a particular customer's needs, the sale or lease of such standard software is a sale at retail subject to retail sales tax or use tax.

[23] *See* Clerk's Papers at 117 (DOR, Determination No. 05-0377, at 2 n.4 (unpublished) (the published, redacted version is available at DOR, Determination No. 05-0377, 27 Wash. Tax Dec. 51, 52 n.2, 2005 Wash. Tax LEXIS 774, at *21) ("The taxpayer also sold hardware and software relating to these services. To the extent these sales were subject to Washington taxation, the taxpayer does not dispute that these sales were properly classified under the retailing classification."), *available at* http://taxpedia.dor.wa.gov/zipfiles.htm).

contract contains an entire page explaining pricing for the monthly OmniTRACS service, as well as several paragraphs dedicated to the OmniTRACS service's use and function. CP at 184-90. This stands in sharp contrast to the data processing company's form contract that contained a single reference to "on-line availability." 9 Wash. Tax Dec. 280-1, at 2. Overall, Qualcomm's materials emphasize that moving information between a dispatch center and the trucks' distant locations is a vital part of the benefit that Qualcomm's customers receive. Unlike the telephone connection to a data processing service or travel reservation service, the OmniTRACS service's transmission of information is an end in itself.

¶37 The fact that the OmniTRACS service is not useful without the hardware and software does not mean that the primary purpose test should apply to the entire OmniTRACS system. Plenty of items are classified separately for tax purposes but have no practical value standing alone. Traditional phone service provides an excellent example. Like the hardware and software in Qualcomm's system, a phone is an item of tangible personal property subject to retail sales tax. The customer often simultaneously buys a phone and signs up for a monthly plan allowing access to a telephone network. Without the monthly network service, the phone itself would be useless, and the monthly service would likewise be worthless without the phone. But the purchaser understands that the phone and the service are two separate and equally valuable components of an integrated system, and accordingly, the two are taxed separately. In fact, the majority says that taxing telephone service separately from telephone equipment was the legislature's goal when it originally created the tax category of " 'network telephone service.' " Majority at 135.

II.   The primary purpose of the OmniTRACS service is transmission of data

¶38 Once it has been established that the primary purpose test should apply to the OmniTRACS service alone, the

question is what primarily motivates Qualcomm's customers to purchase the OmniTRACS service. The service does perform limited processing functions, such as triangulation to determine the trucks' locations, date- and time-stamping of the incoming messages, and storage of messages until customers choose to retrieve them. But when one considers the primary obstacle a trucking company wants to surmount—the miles of physical distance between its dispatch center and its fleet of trucks—transmission of information emerges as the dominant purpose. Just like a traditional telephone, the OmniTRACS service allows nearly instant communication between parties scattered across the country. The information processing that occurs, while useful, could not take place if the information was not first transmitted.

¶39 The fact that the service " 'does not serve as a replacement for a driver's cell phone' " is a red herring. *See* majority at 144 (quoting Br. of Amici Curiae Washington Trucking Associations and American Trucking Associations Inc.). In *Western Telepage, Inc. v. City of Tacoma Department of Financing*, 140 Wn.2d 599, 998 P.2d 884 (2000), we established that a "network telephone service" under former RCW 82.04.065(2) need not provide two-way, free flowing communication by holding that a one-way paging service was a "network telephone service." Just as an on-call physician might have a cell phone for personal use and a pager for emergency patient calls, a truck driver might have a cell phone for personal use and the OmniTRACS service for routine, work-related messages. The fact that each service has different practical advantages and uses does not undermine the conclusion that the core purpose of both is to transmit information from one point to another.

III. Conclusion

¶40 The primary purpose test should be applied by evaluating the customer's purpose in purchasing only the OmniTRACS service, not the entire OmniTRACS system. Looking at just the OmniTRACS service shows that trans-

mission of information is the customer's main objective, while information processing is an important but secondary goal. Because the primary purpose of the OmniTRACS service is to transmit data for hire, it is taxable as a "network telephone service" under former RCW 82.04-.065(2). I would affirm the Court of Appeals.

MADSEN, C.J., and STEPHENS, J., concur with FAIRHURST, J.

After modification, further reconsideration denied June 28, 2011.