# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| FPR II, LLC, | No. 53266-2-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Respondent. | |

CRUSER, J. — FPR II, LLC (FPR), a company engaged in recycling, appeals the superior court's order on summary judgment dismissing its complaint for a refund of business and occupation (B&O) taxes the Department of Revenue (DOR) imposed under the "service and other activities" classification. FPR argues that the superior court erred in granting summary judgment in favor of DOR because FPR is entitled to the "processing for hire" B&O tax classification rather than the service and other activities classification for providing employees to recycling businesses.

We hold that FPR is entitled to the processing for hire B&O tax classification because FPR's employees engaged in manufacturing activities for recycling businesses. Accordingly, we

reverse the superior court's summary judgment order and remand for further proceedings consistent with this opinion.[1]

FACTS

I. BACKGROUND

FPR is a company that provides both employees and management of those employees to businesses in the recycling industry. During the period at issue, FPR contracted with owners of material recovery facilities (MRFs), which are plants that receive a single stream of mixed recyclable material from companies or cities collecting the material from residential homes or commercial entities. FPR contracted with the MRFs to provide employees to work in the facilities. The MRFs utilized the human labor and various machinery and equipment to process and bundle the recyclable material. Once processed and bundled, the MRFs sold the material for an increased price to downstream manufacturers of products made from recyclable material.

The value of the inbound mixed recyclable material received at the MRFs fluctuated. During some periods, cities or companies delivering the mixed material paid the MRFs to take the materials. During other periods, the MRFs purchased recyclable material from cities or companies per ton. At one point, the MRFs purchased the recyclable materials for around $6 per ton and sold the processed and bundled material for about $94 per ton.

The inbound material consisted of a mix of newspaper, mixed paper, glass, cardboard, plastic, tin cans, and aluminum cans. Roughly 20 percent of the material consisted of waste product

---

[1] FPR also argues that (1) if not processor for hire, FPR is entitled to the wholesaling B&O tax classification because its business activities constituted wholesale sales; and (2) if not processor for hire or wholesale sales, FPR is entitled to the retailing B&O tax classification because its business activities constitute retail sales. Because of our holding, we do not address these arguments.

that could not be recycled. At the MRFs, FPR's employees put the recyclable material through various processes in order to remove waste product, separate the materials, and compress like materials into bundles. The process for cleaning, sorting, and bundling the material was as follows:

- The MRFs hauled mixed recyclable material to the facility or accepted delivery of the materials at their plant.
- An FPR employee, known as a loader operator, operated a front-end loader to push the mixed recyclable material into a drum metering feeder system. The system moved the materials on to a conveyer belt.
- The conveyer belt moved the materials to a "pre-sort line" where multiple FPR employees removed garbage or items from the materials that may damage the equipment. Clerk's Papers (CP) at 104. These employees were referred to as "sorters." *Id.*
- The conveyer belt then moved the materials to a mechanical sorting system. The sorting system used additional conveyer belts, as well as a variety of discs, screens, magnets, drums, sensors, air compressors, and other machinery and equipment to separate the mixed materials into separate streams of like materials.
- Throughout the mechanical sorting process, sorters individually manned stations to remove garbage and to ensure that the materials were accurately separated where the machinery and equipment fell short.
- At the end of the process, a conveyor belt moved the separated materials to a baler machine, which was operated by an FPR employee. The baler machine compressed and tied the materials together using wire into a single bundle, or "bale." *Id.* at 133.
- Once baled, FPR employees inspected the bundle for any visible garbage or other dissimilar material that was not accurately separated. FPR employees would attempt to remove the material using pliers or a pry bar.
- Once the bales passed the inspection, an FPR employee loaded the bales onto a trailer using a forklift and moved the bales to a warehouse.

The recyclable materials were baled for storage and transportation purposes. CP at 132-33. Baled materials had a much higher density, which allowed the MRFs to maximize the load transported out of a facility. After the MRFs' customers purchased the bales and the bales were transported to the end location, customers cut the wires on the bale to take the bale apart. The material was then subject to the customers' manufacturing process. The only materials that FPR employees did not bale were glass, large pieces of steel, or items that could not fit in a baler. Glass

was crushed and delivered loosely to customers using a dump truck. Large pieces of steel were hauled to a steel company.

Customers purchased the bales from the MRFs because contaminants were removed from the materials and the materials had been sorted and compressed. For example, without proper sorting and removal of contaminants, a paper mill could not use the material for its own manufacturing process. The value of the recyclable material varied significantly, but the value always increased after processing at an MRF plant.

In addition to providing employees to sort and operate equipment, FPR also supplied employees to perform administrative and management aspects at the MRFs, as well as employees to maintain facility equipment. FPR billed the MRFs for its services by issuing a weekly invoice. FPR charged the MRFs based on the number of employees furnished to the facility, the number of hours worked by each employee, and each employee's assignment.

## II. PROCEDURAL HISTORY

In 2009, FPR requested a tax ruling from DOR regarding its tax rate and how to report taxes in Washington. Based on the information FPR provided, DOR concluded that FPR's activities constituted manufacturing and wholesaling as a processor for hire. A "processor for hire" is any person who performs manufacturing activities on materials that belong to someone else. WAC 458-20-136 (Rule 136).

DOR audited FPR for the period of January 1, 2011 through December 31, 2014. DOR determined that FPR's operations were inconsistent with the operations described to DOR when FPR requested a tax ruling in 2009. DOR concluded that FPR's employees did not engage in manufacturing or wholesaling as a processor for hire and that, instead, FPR engaged in services

that qualified for the service and other activities B&O tax classification under RCW 82.04.290. DOR issued an assessment against FPR consisting of $416,368 in service and other activities B&O tax, penalties, and interest.

FPR appealed the assessment to DOR's Administrative Review and Hearings Division, arguing that FPR's employees provided services that qualify for the processing for hire B&O tax classification because its activities constituted manufacturing under Rule 136. Rule 136 provides that any person performing manufacturing activities on materials that belong to someone else as a processor for hire is taxed under the processing for hire B&O tax classification. WAC 458-20-136. FPR argued that in the alternative, its business activities constituted wholesale sales that qualify for the wholesaling B&O tax classification under RCW 82.04.060 and WAC 458-20-173 (Rule 173). DOR rejected FPR's arguments and upheld the assessment. FPR unsuccessfully sought reconsideration.

FPR brought an action in superior court against DOR seeking a refund of $673,139 for the tax period of January 1, 2011 through December 31, 2016. FPR argued that it was entitled to a refund because its business activities were properly classified under the processing for hire B&O tax classification. FPR argued the processing for hire tax classification is proper because its employees provided services that qualified as manufacturing. Alternatively, FPR contended that the proper tax classification was wholesaling because its business activity of selling services qualified for the wholesaling classification.

DOR moved for summary judgment. DOR asked the court to dismiss FPR's refund action and conclude that as a matter of law, FPR did not qualify for the processing for hire classification because its employees' activities did not amount to manufacturing.

The superior court granted DOR's motion for summary judgment. The court found that there was no genuine issue of material fact, just differences of opinion regarding how the facts should be applied to the law. The court expressly adopted DOR's arguments and ruled that FPR's employees were not engaged in manufacturing or wholesaling. Accordingly, the court dismissed FPR's complaint for a refund.

FPR appeals the superior court's order granting summary judgment.

DISCUSSION

I. STANDARD OF REVIEW

This case presents an appeal from summary judgment. On review of an order for summary judgment, we perform the same inquiry as the trial court. RAP 9.12; *Solvay Chems., Inc. v. Dep't of Revenue*, 4 Wn. App. 2d 918, 922, 424 P.3d 1238 (2018). Summary judgment is proper "only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014) (citing CR 56(c)). We review grants of summary judgment de novo. *Qualcomm, Inc. v. Dep't of Revenue*, 171 Wn.2d 125, 131, 249 P.3d 167 (2011).

Here, the issue presented is how the B&O tax statutes apply to the facts of this case, which is a question of law reviewed de novo.[2] *See Wash. Imaging Servs., LLC v. Dep't of Revenue*, 171 Wn.2d 548, 555, 252 P.3d 885 (2011). As the taxpayer seeking a refund of the B&O taxes that it

---

[2] DOR may prescribe administrative rules to enforce the tax code. Former RCW 82.32.300 (1997). Substantial weight is given to DOR's interpretation of the tax code. *Dep't of Labor & Indus. v. Granger*, 159 Wn.2d 752, 764, 153 P.3d 839 (2007). However, DOR's interpretation is not binding on this court, "and deference to an agency is inappropriate where the agency's interpretation conflicts with a statutory mandate." *Id*.

paid, FPR has the burden of proving that DOR incorrectly assessed the tax and that it is entitled to a refund. RCW 82.32.180; *Qualcomm*, 171 Wn.2d at 131.

## II. LEGAL PRINCIPLES

Washington imposes a B&O tax on those engaging in business in the state. Former RCW 82.04.220(1) (2011). "'"Business" includes all activities engaged in with the object of gain, benefit, or advantage to the taxpayer or to another person or class, directly or indirectly.'" *Steven Klein, Inc. v. Dep't of Revenue*, 183 Wn.2d 889, 897, 357 P.3d 59 (2015) (quoting RCW 82.04.140).

The tax is measured by the application of the tax rate against the value of products, gross proceeds of sales, or gross income of a business. Former RCW 82.04.220(1). Businesses are assessed the B&O tax according to their business activity. Therefore, to impose the tax, the government "must first identify a business activity and then determine which tax measure and rate applies depending on the business activity." *Steven Klein*, 183 Wn.2d at 896-97.

As relevant here, businesses engaged in manufacturing property belonging to others, known as a processor for hire, are subject to the processor for hire B&O classification. RCW 82.04.280(1)(c); WAC 458-20-136(3)(a). Such activities are taxed on "the gross income of the business multiplied by the rate of 0.484 percent." RCW 82.04.280(1).

## III. PROCESSOR FOR HIRE CLASSIFICATION

The dispute in this case centers on whether FPR's business activities constitute manufacturing, qualifying FPR for the processing for hire B&O tax classification. FPR argues that it qualified as a processor for hire because FPR's employees engaged in manufacturing the

recyclable materials that belonged to the MRFs. DOR disagrees, arguing that the services FPR's employees performed did not constitute a manufacturing activity. We agree with FPR.

A person who performs manufacturing activities as set forth under RCW 82.04.120 upon materials owned by others is a processor for hire. WAC 458-20-136(2), (3)(a). Under RCW 82.04.120(1),[3] to "'manufacture' embraces all activities of a commercial or industrial nature wherein labor or skill is applied, by hand or machinery, to materials so that as a result thereof a new, different or useful substance or article of tangible personal property is produced for sale or commercial or industrial use." Therefore, a "processor for hire" is "a person who performs labor and mechanical services upon property belonging to others so that as a result a new, different, or useful article of tangible personal property is produced for sale or commercial or industrial use." WAC 458-20-136(3)(a).

At issue here is whether FPR's business activities at the MRF created "a new, different or useful substance or article of tangible personal property," entitling FPR to the processing for hire tax classification. RCW 82.04.120(1). In issuing the assessment, DOR concluded that FPR's sorting, removing waste, and bundling activities at the MRFs did not create a new, different, or useful product.

The test used to determine whether a new, different, or useful article is produced is articulated in *Bornstein Sea Foods, Inc. v. State*, 60 Wn.2d 169, 175, 373 P.2d 483 (1962). The court set forth an inquiry that compares "whether a significant change has been accomplished when

---

[3] RCW 82.04.120 was amended in 2019 but this amendment has no impact on our analysis, so we cite to the current version. LAWS OF 2019, ch. 202, § 3.

the end product is compared with the article before it was subjected to the process." *Id.* The end

product is the product "at the time it is sold or released by the one performing the process." *Id.*

The *Bornstein* test is "somewhat general in nature and may seem easier as a matter of

articulation than as a matter of application." *McDonnell & McDonnell v. State*, 62 Wn.2d 553,

556, 383 P.2d 905 (1963). To aid in applying the *Bornstein* test, *McDonnell* identified multiple

factors courts should consider in determining if the end product is a new, different, or useful

product. *Id.* at 557. Among other factors, courts should consider "[1] changes in form, quality,

properties (such changes may be chemical, physical, and/or functional in nature), [2] enhancement

in value, [3] the extent and the kind of processing involved, [4] differences in demand, et cetera."

*Id.*

Significantly, both *Bornstein* and *McDonnell* emphasized that the term "manufacture" as

used in RCW 82.04.120(1) is not limited to its ordinary meaning. The court in *McDonnell* stated:

> In utilizing the aforementioned factors, it is necessary to bear in mind the
> admonition in *Bornstein* that "In short, we have come to the position now where
> we are classifying as 'manufacturing' activities which realistically are not
> manufacturing in the ordinary sense at all." . . .  This determination is not
> necessarily confined to a classical or orthodox definition of manufacturing.

62 Wn.2d at 557 (quoting *Bornstein*, 60 Wn.2d at 173).

Relevant case law provides guidance in construing the meaning of the term "manufacture."

In *J & J Dunbar & Co. v. State*, our supreme court deemed the process of filtering, diluting, and

bottling barreled whiskey to be manufacturing. 40 Wn.2d 763, 764-66, 245 P.2d 1164 (1952). This

process involved removing raw whiskey from charcoal-lined oak barrels and passing the raw

whiskey through filters and a screen to remove the charcoal and any other objects or remaining

particles. *Id.* at 764. The liquid was then pumped into tanks and mixed with water to reduce the

9

alcohol content and then piped into bottles, which were capped and sealed. *Id.* at 765. The process used labor and skill to transform raw whiskey unsuitable for consumption into a different, useful substance: a beverage suitable for consumption. *Id.* at 766.

In *Bornstein*, the court concluded that transforming a whole, fresh fish into individual and frozen fish fillets for sale constituted manufacturing under RCW 82.04.120. 60 Wn.2d at 172-73, 175. The taxpayer purchased varying species of bottom fish, separated the flesh from the skin and removed inedible portions of the fish, cut the sides of the fish into appropriately sized fillets, and then packaged and froze the fillets. *Id.* at 170-71. In coming to its conclusion, the court confronted the issue that even after the filleting process, the end product was still fish but in a different form. *Id.* at 176-77. The court determined that the crucial point was that the process changed a product to make it more usable. *Id.* at 177. Although still a fish, the process of preparing, packaging, and freezing a "valueless whole bottom fish into useful and salable consumer items" accomplished a significant change. *Id.*

Similarly, in *McDonnell*, the court held that preparing and processing whole peas into split peas was manufacturing. 62 Wn.2d at 556-57. The taxpayer removed foreign material and defective peas, steamed to soften the peas, and then split the peas by feeding the peas into a splitter machine multiple times. *Id.* at 554-55. The peas were then cleaned and polished before packed for shipment. *Id.* at 555. The court adopted the reasoning in *Bornstein*, determining that the taxpayer's activity closely resembled the processing of a fish, and in both cases the taxpayer produced an end product with a different demand. *Id.* at 556. The significant change from a whole fish to a fish fillet was analogous to the significant change from whole peas to split peas. *Id.* Thus, the process constituted manufacturing. *Id.*

We first consider whether FPR's employees changed the incoming materials so that the finished product became more valuable. *McDonnell*, 62 Wn.2d at 557. Before any processing took place, the MRFs received a single stream of recyclable material. The collection of recyclable material was delivered to the MRFs in a mixed, loose form and contained waste products that could not be recycled. By either manual labor or machinery, FPR's employees sorted and removed garbage from the mixed material. The ultimate goal was to separate the materials by type and then compress and bind like materials together into bales so that the MRFs could resell the materials to their customers.

This process created new, useful products with substantially more value than the single stream of loose recyclable material that FPR's employees started with. In *J & J Dunbar & Co.*, the taxpayer changed the composition of raw whiskey by filtering and adding water to make a bottled drink that was suitable for consumption. 40 Wn.2d at 764-66. Akin to the whiskey, FPR's employees removed waste products and changed the composition of the recyclable material to make a product suitable for consumption by the MRFs' customers. The materials generally could not be sold in a mixed or contaminated state because the mixture contained too many waste products and different types of material to be usable in downstream manufacturers' own processes. While the value of the material fluctuated, the value always increased after processing by FPR employees. At one point, the MRFs purchased the recyclable materials for around $6 per ton and sold the material for about $94 per ton. Therefore, the process of changing the form and composition transformed the nearly valueless recyclable material into a useful and salable item.

DOR concedes that the recyclable material significantly increased in value but asserts that FPR's employees' activities of sorting and cleaning do not constitute manufacturing because even

11

when baled and sorted, the recyclable material was still recyclable material. DOR relies on its previous decision in Wash. Dep't of Revenue, Determination No. 10-0108, 31 Wash. Tax Dec. 1 (2012).

DOR, in Revenue Determination No. 10-0108, applied the *McDonnell* factors to the taxpayer's activities at an MRF. Revenue Determination No. 10-0108, 31 Wash. Tax Dec. at 6. DOR determined that the taxpayer's process of converting a commingled single stream of recyclable materials into condensed bales of recyclable material did not constitute a manufacturing activity. *Id.* at 1-2. DOR noted that while the taxpayer's processing produced a product that had more value than the materials that it started with, the properties and character of the materials did not change, and "the form of those materials does not become something other than recyclable materials." *Id.* at 6.

FPR claims that DOR's conclusion, in Revenue Determination No. 10-0108, that there must be an underlying change to the material is not determinative in this case. In *Bornstein* and *McDonnell*, FPR notes, the court found it immaterial that the end product consisted of the same underlying material as the material subjected to process. Additionally, FPR contends that here although involving the same underlying material, the condensed, sorted recyclable material constituted a new, different, or useful product. We agree with FPR that the change to a fixed, densified form of similar materials constituted a significant change that resulted in a new, different, or useful product.

While a change in the underlying material is a factor for consideration, as FPR points out, it is not a dispositive factor, as explained in *Bornstein* and *McDonnell*. In *Bornstein*, the taxpayer transformed a whole bottom fish into frozen fillets that were readily consumable. 60 Wn.2d at 177.

In *McDonnell*, the taxpayer changed physical aspects and qualities of whole raw peas to make split peas. 62 Wn.2d at 555. The fact that the end product was still a fish or a pea but in a different form was not dispositive. *McDonnell*, 62 Wn.2d at 556; *Bornstein*, 60 Wn.2d at 177. Rather, the decisions were grounded on the fact that the taxpayers' end product, the frozen fillet and the split peas, were new consumer items that were useful in different ways. *McDonnell*, 62 Wn.2d at 556-57; *Bornstein*, 60 Wn.2d at 177.

Additionally, although the underlying substance is similar, the process significantly altered the materials' form and physical properties as compared to its loose form when delivered to the MRFs. The processing of the recyclable materials resulted in compressed, densified bales that were fixed with wire. As opposed to the materials in its loose state, the fixed, densified bales constituted a significant change in physical form. The composition, another physical property, of the bales also changed. FPR employees separated the material by type so that the bales were composed of only like materials; for example, FPR's employees produced separate bales of plastic, cardboard, and aluminum. Additionally, around 20 percent of the materials delivered to MFRs were never compressed into bales and instead were characterized as waste and discarded during processing. This process resulted in a fixed, densified form of similar materials, which is a significant change from the product that FPR began with.

Here, FPR's employees' activities transformed nearly useless materials into new products that could be used by downstream manufacturers instead of being thrown into a landfill.

We conclude that the baled and sorted recyclable material, when compared to loose, mixed recyclable material, endured a significant change that created a new, different, or useful product.

Accordingly, we hold that FPR's employees engaged in a manufacturing activity that qualified FPR for the processing for hire classification of the B&O tax.

## CONCLUSION

We hold that FPR is entitled to the processing for hire B&O tax classification because FPR's employees performed manufacturing activities. Therefore, we reverse the trial court's order granting summary judgment in favor of DOR and remand for further proceedings consistent with this opinion.

CRUSER, J.

We concur:

MAXA, J.

LEE, C.J.