# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| GARTNER, INC., | No. 51637-3-II |
| Appellant, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF REVENUE, | PUBLISHED OPINION |
| Respondent. | |

CRUSER, J. — Gartner Inc. is a global information technology (IT) firm that provides its clients with information and services to aid in making IT-related business decisions. Gartner's services include online access to information in its "Research Library," consulting services, and special events. Our legislature imposes different business and occupation (B&O) tax rates and tax consequences depending on the classification of a business activity. Under our tax system, the sale of "digital products" is taxed under the retailing B&O tax rate and is subject to the retail sales tax.

The Department of Revenue (DOR) assessed Gartner with a retailing B&O tax and the retail sales tax. Gartner paid the assessment and filed a refund lawsuit in Thurston County Superior Court. The superior court granted DOR's summary judgment motion, upholding the assessment. Gartner appeals, arguing that its business activities should instead be subject to the service B&O tax and not the retailing B&O tax.

We hold that Gartner's business activity of selling online access to information in its Research Library is subject to the retailing B&O tax and the retail sales tax as a sale of a digital automated service. Consequently, we affirm the superior court's order granting DOR's summary judgment motion upholding DOR's assessment.

FACTS

I. GARTNER RESEARCH INC.

Gartner is a global IT research and advisory firm that provides proprietary technology-related information and services. Gartner provides "insight, analysis, and hands-on assistance to help clients utilize technology in a way that helps them grow and thrive." Clerk's Papers (CP) at 130. Gartner's client base includes companies, government agencies, and professional services firms. Gartner offers services to its clients in three separate lines of business: (1) research, (2) consulting, and (3) events. At issue on appeal is Gartner's research service titled "Gartner Research." *Id.* at 131.

Gartner Research is a "'subscription based-research and related service'" in which Gartner provides clients with a license to use its services and access to Gartner Research content. *Id.* at 36. Gartner offers its clients various service packages and "[l]evels of [a]ccess" to their research. *Id.* at 149. A research service package is specifically tailored to different types of organizations as well as different job titles within a client's organization. For example, Gartner offers packages entitled "Gartner for IT Leaders," "Gartner for Business Leaders," and "Gartner for Supply Chain Leaders." CP at 533. Each research service package offers any or all of the following services: (1) online access to proprietary research documents in Gartner's Research Library, (2) analyst inquiries and consulting, (3) webcasts, and (4) summit or symposia tickets.

2

Access to Gartner's proprietary research documents comprises the majority of the services Gartner provides to its clients. Gartner's proprietary research documents consist of published "reports, briefings, updates, alerts, newsletters, and other related tools" that cover specific topics (collectively, Research Content). *Id.* at 696. Gartner continually updates and creates new Research Content to ensure that clients receive current information.

Gartner delivers its Research Content "directly to the client's desktop" by providing online access to its Research Library. *Id.* at 533. Gartner sells a "license" or "subscription" to a client-specific "subsite[ ]" or "portal," which permits a user to view Research Content in Gartner's Research Library. *Id.* at 330. To access Gartner's Research Content, each licensed user must input a client specific username and password into the Gartner website. Once a client logs in, Gartner's general website automatically directs the client to a client-specific portal. Each portal is "designed to provide the information that is most of interest" to the client by targeting information that relates to the specific product purchased by the client. *Id.*

After a client is directed to their portal, the client may access Research Content that relates to their service package by using the portal's search function. The search function is not analogous to a regular "Google" search. Instead, the client may search a specific term, and the portal provides an "index" of related terms or search by entering a topic, date, or author to access relevant material. *Id.* at 350. A client portal also features the ability to view "'trending'" areas of interest from a drop-down menu, which directs the client to a customized search result according to the topic a client selects. *Id.* at 420. Once a client accesses a published document such as a "Research Report," the client may browse other related reports by clicking on a link located at the end of the previously viewed reports. *Id.* at 309. A client may also "share" a summary of a research

document by clicking "'Email this Summary'" located on each Gartner Research document. *Id.* at 286.

Clients access Research Content by searching the Gartner website (30 percent) or by clicking links to documents on previously viewed documents (35 percent). A client may also "opt in" to receive e-mail notifications from a Gartner employee on a publication of a Research Report on specific topics (35 percent). *Id.* at 331. If a client receives an e-mail notification, the client may click a link in the e-mail that directs them to the Gartner website where the client may log in to view the Research Report.

A client may pay additional "Research Fees" for a package that provides access to human interaction with Gartner employees. Additional research services that involve human interaction include (1) on-site or telephonic analyst inquiries, (2) access to webcasts or online seminars offered to multiple clients simultaneously, and (3) tickets to live summits or conferences. Roughly 95 percent of Gartner's clients purchase access to the Research Library and either one or a combination of the above interactive services. The remaining 5 percent purchase access to the Research Library alone.

Each "Service Agreement" lists a single Research Fee. The agreements do not itemize the prices of the services included within each package. Rather, the agreements reference a "Service Description," which provides a detailed description of the purchased services included in the Research Fee. *Id.* at 277. However, neither the Service Agreements, Service Descriptions, nor any invoices identify the specific price of each component purchased. Clients are not obligated to make any additional payments other than the Research Fee that is due at the time the client enters the Service Agreement.

51637-3-II

All Gartner content remains owned and copyrighted by Gartner. Clients are permitted to access and view content, but a client is generally not permitted to send, download, save, or copy Research Content.

All research is "commissioned internally by an agenda manager." *Id.* at 308. An agenda manager identifies topics for research based on broad trends, patterns, or forecasts in the IT industry, as well as client requests in the "aggregate." *Id.* at 343. Once a topic is identified by an agenda manager, research analysts perform extensive research on the topic and prepare draft findings. The draft findings are then subject to an extensive review process by peers, management, and vendors and are eventually published to Gartner's website as a Research Report.

Gartner uses software to manage the content that is posted on its website. Gartner's website tracks client activities using the client's "browser[s] and [identification]" and utilizes "Lotus Notes" to manage its Research Library. *Id.* at 358, 634, 815.

## II. Procedural History

DOR audited Gartner for the period of January 1, 2007 through December 31, 2011. DOR issued an initial assessment that assessed Gartner in the amount of $3,118,461. For the period of January 1, 2011 through December 31, 2011, DOR assessed Gartner with a retailing B&O tax and the retail sales tax on the Research Fees on the grounds that Gartner's service of providing access to the Research Library was a digital automated service subject to the retailing classification of the B&O tax.[1]

---

[1] DOR did not impose the retail sales tax on Gartner prior to January 1, 2011 because DOR had not considered "online searchable databases" to be digital automated services. CP at 79, 801. In November 2010, DOR issued a "Special Notice" on "Online Searchable Databases" providing that

Gartner appealed DOR's retailing B&O tax and the retail sales tax assessment on its Research Fees to DOR's Appeals Division, arguing that the retailing classification does not apply because Gartner creates and constantly updates its own content to the Research Library; therefore, the "'application of human effort'" exception to the definition of digital automated services under former RCW 82.04.192(3)(b) (2010) applied. *Id.* at 422. The Appeals Division disagreed, and Gartner moved for reconsideration. The Appeals Division again upheld the audit findings, concluding that Gartner's business activity of providing access to the Research Library was a digital automated service, not a digital good and, therefore, subject to the retailing B&O tax and the retail sales tax.

Gartner paid the assessment and filed a refund lawsuit in Thurston County Superior Court pursuant to RCW 82.32.180. The parties both moved for summary judgment. The superior court granted DOR's motion for summary judgment, upholding the assessment. Gartner appeals.

DISCUSSION

I. LEGAL PRINCIPLES

This case presents a review of an order for summary judgment involving the interpretation of an administrative statute. *See Sprint Spectrum, LP v. Dep't of Revenue*, 174 Wn. App. 645, 657,

---

[t]he [DOR] has determined that online searchable databases (OSD) are digital automated services (DAS). As such, they do not qualify for the exemption provided for digital goods used solely for a business purpose.

. . . .

OSDs, such as online legal research services, are DAS because they are transferred electronically and use one or more software applications. While these services provide "data, facts, or information" similar to a [digital good], they also provide additional functions, such as search, retrieve, and storage capabilities (software applications).

*Id.* at 236.

302 P.3d 1280 (2013). On review of an order for summary judgment, we perform the same inquiry as the trial court and we "consider only evidence and issues called to the attention of the trial court." RAP 9.12; *Solvay Chems., Inc. v. Dep't of Revenue*, 4 Wn. App. 2d 918, 922, 424 P.3d 1238 (2018). We review grants of summary judgment and questions of law de novo. *Qualcomm, Inc. v. Dep't of Revenue*, 171 Wn.2d 125, 131, 249 P.3d 167 (2011). "Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Sheehan v. Cent. Puget Sound Reg'l Transit Auth.*, 155 Wn.2d 790, 797, 123 P.3d 88 (2005).

The burden falls on the taxpayer to prove that the tax as paid was incorrect. RCW 82.32.180; *Qualcomm*, 171 Wn.2d at 131. A taxpayer claiming to be exempt from a tax has the burden of establishing the exemption. *Lamtec Corp. v. Dep't of Revenue*, 170 Wn.2d 838, 843, 246 P.3d 788 (2011). However, we construe an ambiguous tax statute in favor of the taxpayer. *Qualcomm*, 171 Wn.2d at 131.

DOR may prescribe regulations to enforce the tax code. Former RCW 82.32.300 (1997). "The rules of statutory construction apply to agency regulations as well as statutes." *Tesoro Ref. & Mktg. Co. v. Dep't of Revenue*, 164 Wn.2d 310, 322, 189 P.3d 28 (2008). We give great deference to DOR's interpretation of its own regulations; however, DOR's interpretation is not binding on this court. *Dep't of Revenue v. GameStop, Inc.*, 8 Wn. App. 2d 74, 82, 436 P.3d 435, *review denied*, 193 Wn.2d 1026 (2019).

## II. RETAILING B&O TAX AND RETAIL SALES TAX

Washington imposes a B&O tax upon persons engaged in the business of making "sales at retail" in this state. RCW 82.04.250(1); *Bucoda Trailer Park, Inc. v. State*, 17 Wn. App. 79, 81, 561 P.2d 1100 (1977). The retail sales tax is to be collected by the seller on each "retail sale" in this state. RCW 82.08.020(1)(a); *Bucoda*, 17 Wn. App. at 81. "Sales at retail" and "retail sales" include sales of certain digital goods and digital automated services. RCW 82.04.050(8)(b). Therefore, the sale of digital goods and digital automated services are subject to the retailing B&O tax and the retail sales tax, unless an exception applies. WAC 458-20-15503(202), (203) (Rule 15503).

Washington's tax system imposes different B&O tax rates depending on the nature of the business. As relevant here, the "retailing B & O" tax rate is lower than the "service B & O" tax rate. *Qualcomm*, 171 Wn.2d at 127; former RCW 82.04.257 (2010), .290(2). Additionally, the retail sales tax applies to some transactions but not others. "Digital products" as defined by statute, are subject to both the retailing B&O tax and the retail sales tax. However, a "professional service" is subject to the "service B&O" tax rate and generally not the retail sales tax. RCW 82.04.290; WAC 458-20-224.

51637-3-II

## III. DIGITAL PRODUCTS

There are two distinct types of "digital products"[2] subject to the retail sales tax: "digital automated services" and "digital goods." Former RCW 82.04.192(7) (2010); Rule 15503. A "[d]igital automated service" is defined as "any service transferred electronically that uses one or more software applications." Former RCW 82.04.192(3)(a). "Digital goods" are defined as "sounds, images, data, facts, or information, or any combination thereof, transferred electronically." Former RCW 82.04.192(6)(a) (2010). "[T]ransferred electronically" means "obtained by the purchaser by means other than tangible storage media. It is not necessary that a copy of the product be physically transferred to the purchaser. So long as the purchaser may access the product, it will be considered to have been electronically transferred to the purchaser."[3] Former RCW 82.04.192(8) (2010).

Digital automated services and digital goods both involve something that is transferred electronically, but differ as to what is transferred electronically. Rule 15503 is DOR's administrative rule regarding taxation of digital products and provides guidance on differentiating between digital goods and digital automated services. The rule is as follows:

---

[2] In 2009, the Washington Legislature enacted comprehensive "digital products" legislation. LAWS OF 2009, ch. 535. The digital products legislation was, in part, a response to remain in conformity with the Streamlined Sales and Use Tax Agreement (SSUTA), RCW 82.58.030, which "is a cooperative effort of 44 states, the District of Columbia, local governments and the business community to simplify and make more uniform sales and use tax collection and administration by retailers and states." CP at 652; LAWS OF 2007, ch. 522, § 136(3)(a).

[3] Generally, a product is electronically transferred when it is transferred to the purchaser using the public internet, a private network, or both. Rule 15503(102). For example, a digital movie is electronically transferred when a purchaser downloads or streams the movie from the internet. *Id*. In contrast, a movie is purchased on tangible media and therefore not electronically transferred when the purchaser buys a movie in a digital versatile disc format. *Id*.

9

> **Distinguishing a digital good from digital automated services.** A digital good is not a service involving one or more software applications. A digital good consists *solely of images, sounds, data, facts, information or any combination thereof*. Clear examples of digital goods are digital books, digital music, digital video files, and raw data.

Rule 15503(203)(a)(i) (emphasis added).

In contrast, digital automated services may include a digital good if that good was standing alone:

> **Digital automated services may include.** One or more software applications either prewritten or custom, as well as components that are similar to stand-alone digital goods. For example, an online information service may contain data, facts, or information the use of which is facilitated by one or more software applications that provide *search capabilities and other functionality*. Thus, digital automated services will include software and *may include elements similar to stand alone digital goods, which operate together in an integrated fashion to provide an electronically transferred service*.

Rule 15503(203)(a) (emphasis added).

Again, the difference is in what is transferred electronically. Digital goods involve a transfer of *goods* that consist "solely of images, sounds, data, facts, and information." Rule 15503(203)(a)(i). In contrast, a digital automated service involves the transfer of *services* and "may include elements similar to stand alone digital goods, which operate together in an integrated fashion to provide an electronically transferred service." Rule 15503(203)(a). In other words, the customer's access or use of the good is facilitated by the software, making the product a service.

Digital products transferred to an end user are generally subject to retail sales tax regardless of whether the purchaser's right is permanent or the purchaser is obligated to make continued payments as a condition of the sale (e.g., "subscriptions"). Rule 15503(201). However, certain exclusions apply to the definitions of digital goods and digital automated service. A service or product that is transferred electronically but "primarily involves the application of human effort

by the seller, and the human effort originated after the customer requested the service" would not be classified as a digital automated service or digital good and therefore would not be subject to the retail sales tax. Former RCW 82.04.192(3)(b)(i); Rule 15503(301)(d).

A. EVIDENCE CONSIDERED ON APPEAL

As an initial matter, Gartner argues that consideration of specific evidence in DOR's brief is improper because the evidence is outside of the record. Gartner challenges DOR's citations to a 2018 internet link to Gartner's website and the Appeals Division's ruling that supports DOR's claim that Gartner's website allows clients to "search for content, save and organize search results, identify specific areas of interest from a drop-down menu, and create and manage 'alerts' among other functions." Br. of Resp't at 7. Specifically, Gartner contends that we cannot consider the above-referenced facts under RAP 9.12 because DOR did not cite to the link or the Appeals Division's ruling as "evidence" in any of its summary judgment papers below.

RAP 9.12 states, in relevant part,

> On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court. The order granting or denying the motion for summary judgment shall designate the documents and other evidence called to the attention of the trial court before the order on summary judgment was entered.

RAP 9.12 does not limit appellate review to evidence "cited" by the parties as "evidence." Instead, it says that the trial court "shall designate the documents and other evidence *called to the attention of the trial court*" before the trial court entered the order on summary judgment. *Id.* (emphasis added). "'The purpose of this limitation is to effectuate the rule that the appellate court engages in the same inquiry as the trial court.'" *Mithoug v. Apollo Radio of Spokane*, 128 Wn.2d

460, 462, 909 P.2d 291 (1996) (quoting *Wash. Fed'n of State Emps. v. Office of Fin. Mgmt.*, 121 Wn.2d 152, 157, 849 P.2d 1201 (1993)).

Here, DOR failed to reference any link to Gartner's website or provide any sort of documentation of evidence contained in Gartner's website in its summary judgment materials submitted to the superior court. Not only was DOR's citation improper under RAP 9.12, DOR provides no explanation on how the functionality of Gartner's website in 2018 has any bearing or relevance to the functionality of Gartner's services in 2011, the time period in question.[4] We decline to consider DOR's reference to Gartner's website link.

On the other hand, the Appeals Division's ruling was made part of the record provided to the superior court. DOR attached the ruling as "Exhibit 11" that was filed concurrently with its "Corrected Department of Revenue's Memorandum in Support of Motion for Summary Judgment" and "Corrected Declaration of Charles Zalesky in Support of Department of Revenue's Motion for Summary Judgment." Additionally, the superior court's order states that both DOR's corrected memorandum and the Corrected Declaration of Charles Zalesky were "called to the attention of the [trial] court." CP at 829.

Furthermore, on summary judgment, Gartner has the burden of proving it is factually exempt from the tax at issue. RCW 82.32.180 ("At trial, the burden shall rest upon the taxpayer to prove that the tax paid by the taxpayer is incorrect, either in whole or in part, and to establish the correct amount of tax."); *Lamtec*, 170 Wn.2d at 843. Here, Gartner did not produce any

---

[4] Moreover, DOR fails to explain how an invitation to visit Gartner's website is proper, considering CJC 2.9(C), which clearly states, "A judge shall not investigate facts in a matter pending or impending before that judge, and shall consider only the evidence presented and any facts that may properly be judicially noticed, unless expressly authorized by law."

evidence to dispute or undermine the Appeals Division's findings of fact at the trial court level. Therefore, we consider the Appeals Division's findings of fact because the ruling was "called to the attention" of the superior court and we engage in the same inquiry as the superior court. RAP 9.12; *Mithoug*, 128 Wn.2d at 462.

The Appeals Division found that Gartner's website includes "alerts," allows clients to search for content, and permits clients to select "'trending' areas of interest from a drop-down menu, which customizes the search results in the Research Library according to the specific topics that the [c]lients have selected." CP at 420. Because the ruling was before the trial court and Gartner does not dispute the Appeals Division's findings at the trial court level or on appeal, we may consider this evidence.

However, the Appeals Division ruling did not find that Gartner's website provides the ability to "save and organize search results" and "create and manage" alerts. Br. of Resp't at 7. The only evidence that would support these findings is the link that DOR improperly provided. Therefore, these facts are outside of the record and we cannot consider them. RAP 9.12.

B. GARTNER RESEARCH PROVIDES A DIGITAL AUTOMATED SERVICE

Gartner argues that DOR incorrectly classified Gartner Research as a digital automated service because it is a "professional service" subject to only the service B&O tax. Br. of Appellant at 14. Specifically, Gartner argues that providing access to its Research Library is not a digital automated service because (1) the "true object" of Gartner Research is providing a professional service, (2) clients enter Service Agreements, not subscriptions, and (3) the Research Reports are a product of the "interactive nature" of Gartner's services. We disagree.

13

Gartner contends that its business activity of selling access to its Research Library cannot be classified as a digital automated service because it does not "use[ ] one or more software applications" as required by former RCW 82.04.192(3)(a). Gartner argues that its service "simply provides users the ability to retrieve *Gartner's own content*." Br. of Appellant at 25. Gartner supports its argument by referring to multiple examples set forth in Rule 15503. Gartner first argues its service is analogous to example 4, which states,

> **Example 4.** Company sells digital music files (i.e., digital goods) on its web site. In order to locate specific digital music files customers may use a free software based search function that is integrated into Company's web site. Customers may also find the digital music file they are seeking by clicking on a series of links to get to the desired music file. Company's software based search function associated with the sale of the digital music file does not transform the sale of the digital music file into a digital automated service. Company is selling a digital good (i.e., music file) subject to retail sales tax and retailing B&O tax.

Rule 15503(203)(a)(i).

In example 4, the company is simply selling digital goods: the music files. The company is not selling the search software that assists customers in locating music files on its website; instead, the website's search software is incidental and facilitates the sale of the digital good. In contrast, Gartner sells a license to access and view content in its Research Library. Gartner does not sell specific content within the library and even prohibits its clients from downloading or saving a copy of content in the Research Library. In other words, Gartner's clients do not use Gartner's search functions to buy digital goods because Gartner's clients already purchased the ability to access the content through the Research Library's search functions.

The search functions featured on Gartner's Research Library are also not analogous to the company's website search function in example 4. Instead, Gartner provides clients with the ability to search a specific term or topic, and the portal provides an "index" of related terms. CP at 349.

14

A client has the option to view "'trending'" areas of interest from a drop-down menu, which directs the client to a customized search result according to the topic a client selects. *Id.* at 420. Once a client accesses a report, the client may browse other related reports using links embedded in reports that a client previously viewed.

Furthermore, Gartner's clients purchase access that is enhanced by a customized client portal or subsite, an *automated* feature that is "designed to provide the information that is most of interest" to a client. *Id.* at 330. Gartner's Research Library includes a client customized portal or subsite that a client is automatically transferred to when a client enters login information on Gartner's general website. After Gartner's general website directs the client to their portal, the client may then access documents using the Research Library's search function to access content.

Gartner also relies on example 3 set forth in DOR's Rule 15503(203)(a)(i). Example 3 states,

> **Example 3.** XYZ provides an online service that uses one or more software applications to facilitate the use of news and information with features such as: Research history, natural and boolean searching, industry chat forums, chart creation, document and word flagging, and information organizing folders. In this example software features facilitate the search of the news or information. XYZ's service is a digital automated service the sale of which is subject to retail sales tax and retailing B&O tax.

*Id*.

Gartner claims that its service is not a digital automated service because unlike XYZ, its Research Library does not provide "'features such as: Research history, natural and boolean searching, industry chat forums, chart creation, document and word flagging, and information organizing folders.'" Br. of Appellant at 25. But as DOR points out, Gartner is "confusing what is sufficient with what is necessary" by overstating what conditions are required for a service to

qualify as a digital automated service. Br. of Resp't at 31. None of the functions featured in example 3 are expressly stated as requirements to a digital automated service. Rather, the examples provide "a general guide" and "[t]he tax consequences in all situations must be determined after a review of all the facts and circumstances." Rule 15503.

Gartner's Research Library does not "consist[ ] solely . . . of . . . data, facts, [or] information." Rule 15503(203)(a)(i). It is clear that selling access to its Research Library involves the electronic transfer of a service, which includes access to digital goods that is "facilitated by one or more software applications that provide search capabilities and other functionality." Rule 15503(203)(a). Gartner's Research Content is comprised of "data, facts, [or] information" analogous to a digital good because the content includes published "reports, briefings, updates, alerts, newsletters, and other related tools" that cover specific topics and are delivered directly to the client's desktop electronically. Rule 15503(203)(a)(i); CP at 696. Gartner's Research Content, a digital good, "operate[s] together in an integrated fashion" with the website's search software "to provide an electronically transferred service." Rule 15503(203)(a). Therefore, we hold that Gartner's business activity of selling subscriptions to access its Research Library is a digital automated service.[5]

C. THE "TRUE OBJECT" TEST DOES NOT APPLY TO GARTNER'S SERVICES

Gartner also argues that access to its Research Library is not a digital automated service because the "'true object'" of Gartner Research is a professional service, therefore its service

---

[5] Gartner argues that Gartner Research is not a digital automated service because it is a professional service under RCW 82.04.290(2). Because we hold that Gartner's business activity of selling subscriptions to access its Research Library is a digital automated service subject to the retailing B&O tax and retail sales tax, we decline to address Gartner's argument.

should be subject to the service B&O tax classification. Br. of Appellant at 14. Gartner applies the "'true object'" test set forth in *Qualcomm* to reach its conclusion. Br. of Appellant at 14; 171 Wn.2d at 140. DOR disagrees, arguing that the "bundled transaction statute" rather than the common law "'true object'" test set forth in *Qualcomm* applies. Br. of Resp't at 24 (bold omitted). We agree with DOR.

In *Qualcomm*, our Supreme Court applied the "true object" test to determine the tax classification of a business activity. 171 Wn.2d at 140-44. The parties disagreed as to whether the taxpayer's service constituted a telecommunications service subject to the retailing B&O tax or an information service subject to service B&O tax. *Id.* at 130-32. The taxpayer's service provided two components that when separated were subject to different tax classifications: an information service that included electronic transmission of raw data (telecommunications service) and processing of the raw data (information service). *Id.* at 136. However, the taxpayer's service was useless without both components because raw data was unintelligible without first being processed. *Id.* at 143-44. Therefore, the system involved "components that cannot be reasonably separated." *Id.* at 140. The parties agreed that "when an activity involves both transmission and information processing components that cannot be reasonably separated, the true object test applies to determine the proper tax classification."[6] *Id.* at 140.

The court held that the data processing service component of the taxpayer's service was the true object because the taxpayer's customers sought to acquire the specific information, not raw data. *Id.* at 142, 143. Because data processing was the true object of the customer and the

---

[6] The "true object" test and the "primary purpose" test are used interchangeably. *Qualcomm*, 171 Wn.2d at 140.

data processing component could not be reasonably separated from electronic transmission of raw data, the court held that the service as a whole should be taxed as information service subject to service B&O tax. *Id.* at 144.

Gartner argues that we are obligated to apply the true object test because the test applies when, as here, only one product is sold and the product "could be subject to either the service B&O tax classification or the retailing classification." Br. of Appellant at 14. We disagree, because Gartner Research is distinguishable from the taxpayer's service in *Qualcomm*. In *Qualcomm*, the court noted that the true object test applies when services "cannot be reasonably separated." 171 Wn.2d. at 140. A Gartner Research package contains access to its Research Library and the option to purchase other interactive services, such as access to analyst inquiries, analyst consulting, and online webcasts. However, unlike the service in *Qualcomm*, access to Gartner's Research Library standing alone does not render Gartner Research as a whole useless.[7] Gartner states that it "does not separately sell 'online access' to its research reports." Reply Br. of Appellant at 4. Instead, Gartner claims a client may "choose to receive Gartner Research without direct interaction with analysists," which Gartner claims is a "more limited means of receiving Gartner's service." *Id.* The ability to "choose" to pay a lower fee to just receive access to Gartner's Research Library is in itself proof that Gartner Research contains separable components.

Gartner also supports its argument by referring to DOR's "Study of the Taxation of Electronically Delivered Products" ("Study"). Gartner's reliance on DOR's Study is also unpersuasive. The Study states that "[t]he key to determining whether a digital product is merely

---

[7] Gartner's Service Description states, "Gartner . . . provides clients with access to research and advice about information technology and the functional responsibilities of specific IT roles *as well as the option* of inquiry with Gartner Analysts. CP at 151 (emphasis added).

18

the representation of a professional service depends on whether the true object of the transaction is the sale of professional services or of a digital product." CP at 372. The Study provides an example of when the sale is the sale of a digital product:

> [A] standard "fill in the blank" will drafted by an attorney and sold electronically via download to multiple customers would not be the representation of professional services and would be subject to the retail sales tax. This is because the true object of the transaction is the sale of the digital product (the standard will form), not the professional services that have been individualized for the client.

*Id.*

The Study uses the "true object" of the transaction to determine how to classify a single transaction with one component: a standard will. The Study does not use the "true object" test to determine how to classify *separable components* of one transaction, like the components of Gartner Research.

When a retail sale contains separable components, the sale is characterized as a "bundled transaction" under RCW 82.08.190(1). A bundled transaction is the retail sale of two or more products where (1) "[t]he products are otherwise distinct and identifiable" and (2) "[t]he products are sold for one nonitemized price." RCW 82.08.190(1)(a).

Here, Gartner sells a "bundled transaction" as defined by RCW 82.08.190(1)(a). Gartner sells two or more products for one nonitemized price. Each Gartner Research service package provides clients with a subscription to Gartner's Research Library, an online searchable database that constitutes a digital automated service. A Gartner Research service package also offers other distinct interactive services. These services are distinct and identifiable from purchasing a service package that contains access to only the Research Library. This is further evidenced by a client's ability to purchase access to only the Research Library and forgo other available services.

19

Additionally, the agreements do not itemize the prices of the services provided within each package. Rather, Gartner offers each package for a single Research Fee.

Therefore, we hold that the "true object" test does not apply because Gartner Research is a "bundled transaction" as defined by RCW 82.08.190(1)(a).

### D. GARTNER'S DIGITAL AUTOMATED SERVICE DOES NOT INVOLVE "HUMAN EFFORT"

Gartner argues that access to its Research Library is not a digital automated service because the "human effort" exclusion to digital automated services applies. Br. of Appellant at 19; former RCW 82.04.192(3)(b)(i). Gartner claims its service "'primarily involves the application of human effort'" because the Research Content is created by analysts, and Gartner's employees interact with clients through analyst inquiries and other services. Br. of Appellant at 20. We disagree.

A digital automated service does not include "[a]ny service that primarily involves the application of human effort by the seller, and the human effort originated after the customer requested the service." Former RCW 82.04.192(3)(b)(i). DOR's Study provides additional examples to distinguish between a service involving primarily human effort and a digital automated service. "[A] help desk service that uses an 'instant messenger' to allow the client to 'chat' with the technician would not be a digital automated service." CP at 644. The help desk service involves the application of human effort, and the human effort originated as a direct response to a request. In contrast, "a searchable database of 'help desk' articles, tips, and Q&A's would generally be considered digital automated services." *Id*. Presumably, the content in the searchable database is a response to numerous or "common" client questions regarding a specific product. However, the searchable database is still considered a digital automated service because it does not involve any application of human effort as a response to a specific customer's question.

Rule 15503 provides guidance of when "the human effort originated after the customer requested the service:"

> **Professional or personal services** represented in electronic form are not a digital good. This exclusion applies where the service primarily involves the application of human effort by the service provider, and the human effort originated after the customer requested the service. For example, an electronic engineering report created *at the customer's request* that reflects an engineer's professional analysis, calculations, and judgment, which is sent to the customer electronically, is considered evidence of a professional service and not a digital good.

Rule 15503(302)(d) (emphasis added); former RCW 82.04.192(6)(b)(iv)(A).

Gartner argues that its service should be excluded under former RCW 82.04.192(3)(b)(i) because "the statute contains a temporal element, not a causal one" and Research Content is "overwhelmingly read within the first three months of publication." Br. of Appellant at 22. However, Gartner's argument is misplaced. First, Gartner's service of providing access to its Research Library does not meet the temporal element of the exception. When a client enters a Service Agreement, the Research Library already exists and clients obtain access to Research Content that Gartner created and published *before* a client obtained access. Second, it is unclear how Gartner reaches its conclusion that the exclusion does not contain a "causal" element, as Gartner does not provide us with any citation or a statutory interpretation analysis. The plain language of former RCW 82.04.192(3)(b)(i) suggests otherwise: "[a]ny service that primarily involves the application of human effort by the seller, and the human effort originated *after* the customer requested *the service*." (Emphasis added.) The statute refers to one specific client who requests the specific service that primarily involves human effort.

Here, Gartner's human effort does not originate after any one customer requests the service. Gartner does not perform any research or publish any Research Content, the services that primarily

involve the application of human effort, as a direct response to a client's request. Rather, Gartner employees identify topics for research based on broad trends, patterns, or forecasts in the IT industry, as well as client requests in the "aggregate." CP at 343. Moreover, there is no provision in the Service Agreement even permitting Gartner's clients to request Gartner perform any specific research on the client's behalf.

Gartner also argues that Gartner Research is exempt from the retailing classification under the "'human effort'" exclusion because interactive services between Gartner and its clients occur after a client signs up for the service. Br. of Appellant at 22. Here, Gartner is referring to other services available in its service packages, not online access to its Research Library. The interactive services are inapplicable to this analysis because, as discussed above, selling access to its Research Library is a separate component that constitutes a digital automated service. Therefore, Gartner's arguments relating to other services offered in its service packages are not persuasive.

We hold that Gartner's activity of selling access to its Research Library is not exempt under the digital products "human effort" exclusion set forth in former RCW 82.04.192(3)(b)(i) because Gartner's human effort does not "originate after the customer requested the service" and Gartner's human effort is not in response to a specific client request.

## IV. INTERNET TAX FREEDOM ACT

Gartner argues that applying the digital products law to Gartner's Research Fees violates the Internet Tax Freedom Act (ITFA). 47 U.S.C. § 151 note (Moratorium on Internet Taxes § 1101). We disagree and hold that Gartner provides no evidence of a conflict between the ITFA and Washington's digital products legislation.

The federal constitution provides that laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution of Laws of any State to the Contrary notwithstanding." U.S. CONST., art. VI, cl. 2. Under the supremacy clause, state laws are not superseded by congressional legislation unless that is the clear purpose of congress. *McKee v. AT &T Corp.*, 164 Wn.2d 372, 387, 191 P.3d 845 (2008). "Conflict preemption is found where it is impossible to comply with both state and federal law or where state law 'stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.'" *Id.* (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984)).

There is a strong presumption against finding preemption, and the burden of proof is on the party claiming preemption. *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 327, 858 P.2d 1054 (1993). Thus, Gartner must show that congress's intent or goals set forth in the ITFA would be truly frustrated if Gartner was required to comply with Washington's digital products legislation.

The ITFA provides that no state may impose "[m]ultiple or discriminatory taxes on electronic commerce." 47 U.S.C. § 151 note (Moratorium on Internet Taxes § 1101(a)(2)). A state tax is discriminatory under the ITFA if the tax imposed by a state on electronic commerce "is not generally imposed . . . on transactions involving similar property, goods, services, or information accomplished through other means" or "imposes an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means." 47 U.S.C. § 151 note (Definitions of Internet Taxes § 1105 (2)(A)(i), (iii)).

23

Gartner relies on *Performance Marketing Ass'n., Inc. v. Hamer*, 2013 IL 114496, 998 N.E.2d 54, 375 Ill. Dec. 762, to support its assertion that DOR's classification of Gartner Research as a digital product results in discriminatory conduct because it "'singl[es] out'" taxpayers who provide services via the Internet. Br. of Appellant at 28. *Hamer* involved a state online marketing tax that was preempted by the ITFA because it singled out out-of-state retailers providing an internet service. 2013 IL 114496, ¶ 20. The court found the state tax was preempted by the ITFA because it did not apply to the same activity if performed offline instead of online. *Id* at ¶ 21. Therefore, the state tax was a "discriminatory tax on electronic commerce within the meaning of the ITFA" and was expressly preempted by the ITFA. *Id.* at ¶ 23.

Here, DOR assessed retailing B&O tax and retail sales tax on Gartner's Research Fees on the grounds that Gartner's service of providing access to the Research Library was a digital automated service subject to the retailing classification under former RCW 82.04.257. Gartner states that "[t]here is no dispute that if Gartner still sent Research reports to clients by mail or CD, as it once did, . . . Gartner Research would remain subject to the service B&O tax." Br. of Appellant at 27. Gartner argues that DOR has applied a higher tax rate only because its services are "'electronically transferred,'" which is prohibited by the ITFA. *Id*. However, simply sending its clients Research Content by e-mail is not the equivalent of Gartner selling access to its Research Library. As discussed above, access to Gartner's Research Library is a digital automated service that is transferred electronically *and* uses one or more software applications. Former RCW 82.04.192(3)(a).

Therefore, we hold that application of the retail sales tax on Gartner's automated digital service does not violate the ITFA.

## CONCLUSION

We hold that Gartner's service providing subscriptions to access an online Research Library is a digital automated service under former RCW 82.04.192(3)(a) and Gartner's Research Fees are subject to the retailing B&O tax and retail sales tax as a bundled transaction under former RCW 82.04.257 and RCW 82.08.190(1)(a). We affirm the superior court's order granting summary judgment.

CRUSER, J.

We concur:

WORSWICK, J.

LEE, A.C.J.